## Bank of La Center, et al. v. Sinnott.

(Decided March 11, 1915.)

### Appeal from McCracken Circuit Court.

Fraudulent Conveyances—Remedies of Creditors—Gift of Husband to Wife—Evidence.—In an action brought by creditors of the husband to subject to the satisfaction of their demands, prop-

erty alleged to have been fraudulently given to the wife, the evidence examined and found not to support the charge of fraud.

D. G. PARK for appellant.

C. C. GRASSHAM, BERRY & GRASSHAM and WM. MARBLE for appellee.

OPINION OF THE COURT BY JUDGE HANNAH—Affirming.

John Sinnott, Sr., in 1865 became a resident of Paducah, and died there on August 31, 1907. For a number of years prior to and until a few days before his death he had been the principal shareholder in a corporation known as the Thompson Wilson & Company, distributors of whiskey. In the latter part of 1907 this corporation failed, and its affairs were liquidated in bankruptcy proceedings. Sinnott was endorser upon some of its paper. There was an action to settle his estate, but only a negligible dividend was realized for the creditors.

The Thompson Wilson & Company was indebted to the Bank of La Center in the sum of two thousand dollars, originally created April 20, 1905; and to the Brookport National Bank in the sum of one thousand dollars, originally created October 19, 1903; and to the National Bank of Metropolis in the sum of one thousand dollars, originally created March 3, 1904; and in the additional sum of fifteen hundred dollars, originally created May 28, 1900. Upon all this paper Sinnott was endorser.

These unsatisfied creditors united in this present action against Mrs. Elizabeth Sinnott, widow of John Sinnott, Sr., and sought to subject to the satisfaction of their claims the rents and profits of certain improved real estate in Paducah owned by Mrs. Sinnott, upon which the plaintiffs claim that Mr. Sinnott, in fraud of their rights as creditors of the Thompson Wilson & Company, had placed valuable improvements and buildings out of his own individual resources.

The chancellor found against the plaintiffs and they are here upon appeal.

The case has been extensively briefed by counsel for the respective parties, and many interesting questions of substantive law and of procedure have been presented, in addition to discussions of the facts themselves; but in view of the conclusions which we have reached

concerning the merits of the case, after a study of the record, we find it unnecessary to dwell upon the legal phases of the controversy.

The facts appearing in the record are substantially as follows: John Sinnott and Elizabeth Sinnott were married in June, 1865. At that time he was twenty-six years of age, and had accumulated from twenty to twenty-five thousand dollars. A short time before the marriage he purchased a lot at the corner of Eighth and Monroe Streets, in the city of Paducah; and, during the summer of 1865, he built thereon, a cottage, the cost of which was about thirty-six hundred dollars, which the Sinnotts occupied as a home until 1894. This property Sinnott conveyed in 1868 to Q. Q. Quigley, trustee for his wife and children, with reversion to himself upon failure of issue; but on May 29, 1901, the trustee and the four children, together with the husband, united in a conveyance thereof direct to Mrs. Sinnott.

In 1868 Sinnott also purchased a lot at the corner of Ninth and Monroe Streets, in Paducah, adjoining the property above mentioned. This, on January 29, 1883, he conveyed to George C. Thompson. Thompson, on May 14, 1884, conveyed it to Quigley, trustee for Mrs. Sinnott; and, on May 22, 1897, the trustee conveyed it direct to Mrs. Sinnott, Thompson joining in the deed, because his deed to the trustee had become misplaced.

In 1876 Sinnott and W. S. Dick purchased a farm in Illinois opposite Paducah, the former causing his half interest to be conveyed in trust for Mrs. Sinnott. In 1884 she purchased Dick's half interest herself. In 1892 she sold the farm for eight thousand dollars, placing the proceeds on temporary loan with the Thompson Wilson & Company, the corporation of which her husband afterwards became the principal shareholder.

In 1877 Sinnott, who had been engaged in the business of constructing improved streets in Paducah and gravel roads, having received as part of the contract price for the construction of the North Ballard Gravel Road certain shares of its capital stock, gave them to his wife; and thereafter she continued to receive dividends thereon until 1897, when she sold the shares to the county for sixty-three hundred dollars. The dividends were eight hundred dollars per annum. This sixty-three hundred dollars she placed on temporary loan with John G. Rinkliffe, a close and trusted friend of her husband,

and owner of one-third of the shares of the Thompson Wilson & Company.

In 1894 Mrs. Sinnott constructed on the lot at Ninth and Monroe Streets a brick residence which the family thereafter occupied as home; and she thereafter received the rentals of their former home at Eighth and Monroe, the property which her husband had given her in 1868.

On May 1, 1897, the day after she received the sixty-three hundred dollars for her Gravel Road shares, Mrs. Sinnott purchased a lot on Fourth Street, in Paducah, from the Paducah Transfer Company, on which there was a large brick livery stable, and which had at one time been owned by her husband. She erected a business building on this lot in 1897, which she leased to the Thompson & Wilson Company at sixty-five dollars per month, and she thereafter received seventy-five dollars per month as the rental of the livery stable.

In 1902 she caused the livery stable to be torn down, and to be erected in its place a brick business building of three store rooms, the building being three stories in height.

It is this Fourth Street property and, in particular, the buildings thereon erected in 1902, the rentals of which the appellants are seeking to subject to the satisfaction of their claims, upon the assertion that John Sinnott, Sr., fraudulently diverted his individual funds into this improvement of his wife's real estate to the prejudice of his creditors.

It appears from the record that, although the deed from the Paducah Transfer Company to Mrs. Sinnott executed in May, 1897, conveying the Fourth Street lot, recited a paid consideration of ten thousand dollars, only one thousand dollars of the purchase price was paid at or about the time of the purchase, the remaining nine thousand dollars being assumed by the purchaser to be paid, five thousand dollars to Henry Burnett and four thousand dollars to Noble & Bonnerman. Shortly after the purchase she paid Noble & Bonnerman three thousand dollars; and in 1902 she paid the remaining one thousand dollars to them out of the proceeds of a note discounted by the First National Bank. At the same time she mortgaged the Fourth Street property to E. W. Smith and obtained a loan of ten thousand dollars, using five thousand dollars thereof in paying the Henry

Burnett note. She then began the construction of the 1902 buildings on the Fourth Street property.

It is the contention of appellee that these buildings were constructed out of her funds remaining with the Thompson Wilson & Company on temporary loan; out of the five thousand dollars remaining from the E. W. Smith loan, together with accrued rentals, and the proceeds of a fifteen hundred dollar note discounted by the First National Bank; leaving certain material bills unpaid when the buildings were completed, but which were later paid out of the rentals.

The appellants contend that a large sum was diverted from the individual resources of John Sinnott, Sr., into the construction of the 1902 buildings.

It would be useless for us to endeavor to reconcile the differing methods of calculation and the divergent results of surmises of counsel for the respective parties in respect of the manner in which these buildings were paid for. The difficulties presented in respect of this matter arise largely from the fact that John Sinnott, Sr., transacted all his wife's business for her, and, in doing so, while he did not mingle her funds with those of the Thompson Wilson & Company, he did not, so far as the record shows, keep her funds separate from his own. And the contentions of counsel grow out of their efforts to trace and distinguish the one from the other.

Counsel for appellants argue that it is altogether improbable that Mrs. Sinnott could have accumulated the money to pay for this property.

The evidence shows that the husband, out of his salary, paid all the expenses of the family, and that Mrs. Sinnott did not use any of her money for this purpose, as there was no occasion therefor.

In order to test the probability of her accumulations amounting to a sufficient sum to pay for the property in question, we have prepared from the evidence in the record a tentative recapitulation of the financial affairs of Mrs. Sinnott from the date of the gifts made to her by her husband in 1876 and 1877 up to and including the completion of the 1902 buildings on the Fourth Street property.

Her receipts appear as follows: Item 1—One-half interest in the Illinois farm presented to her in 1876; valued at $4,000. Item 2—Rentals on her half interest therein from 1876 to 1884, when she acquired the other,

half, eight years at $200 per annum (making allowance for taxes, etc.), $1,600. Item 3—Rentals of this farm from 1884 to 1892, when she sold it, seven years at $400 (making allowance for taxes, etc.), $2,800. Item 4—Dividends on shares in the North Ballard Gravel Road, presented to her in 1877; sold by her in 1897; twenty years at $800 per annum, $16,000 (less amount unaccounted for by the evidence, $12,000), leaving remaining a balance of $4,000. Item 5—Proceeds of these shares in 1897, $6,300. Item 6—Rentals of the cottage at Eighth and Monroe Streets from 1894 to 1902, eight years, at $200 per annum (for maintenance see Item 19 hereafter), $1,600. Item 7—Rentals of the building constructed on the Fourth Street property in 1897, up to and including 1902, five years, at $65 per month, $3,900. Item 8—Rentals on the livery stable on the Fourth Street lot from 1897 to 1902, five years, at $900 per annum, $4,500. Also the following obligations remaining unpaid after the completion of the 1902 buildings on the Fourth Street lot: Item 9—Langstaff-Orme Company, note of September 8, 1902, $1,000. Item 10—Other material claims, $800. Item 11—Note of May 15, 1902, First National Bank of Paducah, $1,500. Item 12—Amount received from E. W. Smith loan, $10,000. Item 13—For interest on funds while loaned to the Thompson Wilson & Company and to Rinkliffe, $1,500. These items aggregate $43,500.

Her disbursements appear as follows: Item 14—Expended for brick residence in 1894 at Ninth and Monroe Streets, $5,000. Item 15—Fourth Street lot, purchase price, $10,000. Item 16—For interest on Henry Burnett note of May 1, 1897 (assumed as part of purchase price), and paid July 21, 1902, $1,500. Item 17—Cost of 1897 building on Fourth Street lot, $7,000. Item 18—Cost of 1902 buildings on that lot, $17,000. Item 19—Taxes, insurance, repairs, etc., on the brick residence at Ninth and Monroe, on the cottage at Eighth and Monroe, on the Fourth Street property to date (estimated), $3,000. These disbursements total $43,500, the same as the receipts.

It is thus shown to have been easily possible for Mrs. Sinnott to have constructed the 1902 buildings on the Fourth Street lots (owing thereon at their completion Items 9, 10, 11 and 12 in above statement) upon the original foundation of the gifts of (1) the cottage at Eighth

and Monroe in 1868; (2) the half interest in the Illinois farm in 1876; and (3) the Gravel Road shares in 1877, without any further aid or gifts from her husband. To contend that she could not have done so is to disregard a fundamental principle of finance, the natural increment of capital.

Had Mrs. Sinnott, in 1876, instead of the half interest in the Illinois farm, valued at $4,000, received that sum in cash, and placed it at simple five per cent. interest until 1894, it would then have amounted to $7,600; while had she received, in 1877, $6,300 in cash, instead of the Gravel Road shares, and placed that sum at simple five per cent. interest, it would, in 1894, have amounted to $11,655.

So that, starting with the two gifts of 1876 and 1877, she would, in 1894, have had in cash $19,255. Deducting therefrom $5,000 spent in 1894 on the brick residence at Ninth and Monroe Streets, and placing the remaining $14,255 at simple five per cent. interest from 1894 to 1902, inclusive, she would then have had $19,957, to which add the rentals on the cottage at Eighth and Monroe Streets from 1894 to 1902, $1,600 (less taxes, insurance, etc., estimated at $600), and she would have had at the close of 1902, $20,957.00 in cash.

Now, what did she have at the end of 1902 in lieu of this $20,957.00 which she would have had by placing the gifts of 1876 and 1877 at simple five per cent. interest, and saving the rentals of the cottage at Eighth and Monroe Streets, which had been given to her in 1868?

She had the Fourth Street property, which had cost her for the lot ten thousand dollars and for the buildings twenty-four thousand dollars, making a total of thirty-four thousand dollars, and she owed against it Items 9, 10, 11 and 12 in the foregoing recapitulation, aggregating $13,300, leaving her an equity in the Fourth Street property of $20,700 as against the $20,957 which she would have had by investing at simple five per cent. interest the gifts of 1876 and 1877 and by saving the rentals of the cottage. "Why should it be thought a thing incredible" that Mrs. Sinnott was able, out of her own resources, to have constructed the 1902 buildings on the Fourth Street property?

2. But, we understand it to be contended by the appellants that the $13,300 embraced in Items 9, 10, 11 and 12 of the foregoing statements, together with $2,500 in

interest coupons on the E. W. Smith mortgage (Item 12) were paid or partly paid by John Sinnott, Sr., during or after 1902.

It appears from the record that the rentals from the several properties owned by Mrs. Sinnott after the completion of the 1902 buildings was $3,000 per annum. The items above mentioned were all paid from 1902 to 1907, the last payment being made in September, 1907, after the death of John Sinnott, Sr.

The evidence for the appellee is to the effect that after the completion of the 1902 buildings these rentals were first applied to the payment of the material-men and the note in bank, after which the mortgage bonds were placed in liquidation; that after paying taxes, insurance, repairs and other expenses, Mrs. Sinnott found the burden a heavy one, and herself not able to pay off the mortgage as rapidly as she desired, and that her son, John Sinnott, Jr., loaned her about four thousand dollars, which was used for that purpose.

It is conceded in brief for appellants that at least $8,135.58 was paid on this mortgage debt by John Sinnott, Sr., by checks drawn on the First National Bank; but appellants contend that these payments were made by him out of his own resources. The evidence, however, shows conclusively that these payments were made out of the rentals and income of Mrs. Sinnott's properties, which were collected by her husband and deposited in bank in his name, and that the money with which these payments were made was not his, but her own. And it is not successfully controverted that, with the exception of two payments, aggregating $1,021, paid by Mrs. Sinnott herself, the remainder was furnished her by John Sinnott, Jr.

3. Appellants also contend that a payment of $1,000 made on July 22, 1902, to Noble & Bonnerman, on account of the debt assumed as part of the purchase price of the Fourth Street lot, was paid by John Sinnott, Sr., out of his own resources, when, in point of fact, this was paid out of the proceeds of a note discounted to the First National Bank, which note was afterwards paid out of the rental income of the properties owned by Mrs. Sinnott.

4. Appellants further argue that the $5,000 paid to Henry Burnett on July 21, 1902, on the note assumed as part of the purchase price of the Fourth Street lot,

was made by John Sinnott, Sr., out of his own resources, when, in point of fact, this money was derived from the $10,000 borrowed from E. W. Smith, and appellants concede it was so derived. That money was Mrs. Sinnott's, not her husband's.

5. Much has been said in the record and in briefs of counsel for appellants concerning alleged irregularities in the affairs of the Thompson Wilson & Company and the probable diversion of the funds of that company by John Sinnott, Sr., into the improvements sought to be subjected to the demands of the appellants.

This concern did quite an extensive and seemingly a very profitable business from the time of organization up until a short time before the death of Sinnott, Sr.

The only evidence offered by either party with reference to the cause of its failure is the testimony of John Sinnott, Jr., and it is as follows:

"Q. Did anything happen in the year 1905 and 1906, or after that time, or 1907, to in any wise affect the solvency of Thompson Wilson & Company or the volume of its business, so far as you know; tell about it? A. In my opinion the firm of Thompson Wilson & Company lost their money by different counties and towns going dry in four Southern States, in which they did practically all their business. They lost in 1905, to the best of my recollection, fifty out of one hundred counties in Alabama. At the same period they lost one hundred and twenty-five out of one hundred and forty in Georgia; they lost over one hundred counties in Northern Texas, for which they later charged off for Texas alone $27,000, which is the best of my belief. And they also lost at this period about three-fourths of the State of Mississippi; and, in 1906 or 1907, the whole States of Georgia and Alabama went dry. They were heavy losers in all three States. Q. State whether or not the fact of various counties going dry had any effect upon the collections of Thompson Wilson & Company in such places for goods already sold? A. Any whiskey man will tell you that when a town or county or State goes dry, you may practically lose all of your outstanding debts."

While we do not feel called upon to advance an opinion as to the cause of the failure of the Thompson Wilson & Company, yet the reason given by John Sinnott, Jr., seems to be a plausible one, and not at all improbable.

These matters, however, cannot affect the rights of Mrs. Sinnott, for, as has been seen, her resources are but the natural increment of the gifts made to her by her husband (1) of the property at Eighth and Monroe Streets in 1868, (2) of the shares in the North Ballard Gravel Road in 1877, and (3) of the half interest in the Illinois farm in 1876.

6. But it is contended by appellants that Mrs. Sinnott received and held these gifts and the accumulations thereof in secret trust for her husband.

The gifts in question were made by deeds duly recorded at the time and at a time when the husband was incontestably solvent and amply able to settle these sums upon his wife without prejudice to any creditor. They were made thirty years before the Thompson Wilson & Company failed; at least twenty years before that corporation ceased to do a satisfactory and prosperous business; and several years before he even became connected with the Thompson Wilson & Company. And the property now owned by her is but the natural accumulation of those gifts without any enhancement resulting from the services, energy or business acumen of the husband.

To say that those gifts were not made in good faith, and that the accumulations thereof are held in secret trust, is to charge the act of giving with sinister qualities which the record does not sustain, and which the court does not believe may fairly be imposed thereupon.

The judgment is affirmed.